# MTC Exhibit "E"

Videotaped Deposition of Janssen Thompson

```
                                                                    1
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                      BEAUMONT DIVISION

 3   CALEB BUTLER and JEREMY    )
     PENNINGTON,                )
 4       Plaintiffs,            )
                                )
 5   VS.                        ) Case No. 1:22-CV-00367
                                )
 6   BNSF RAILWAY COMPANY,      )
         Defendant.             )
 7

 8

 9   *****************************************************
                ORAL AND VIDEOTAPED DEPOSITION OF
10
                       JANSSEN THOMPSON
11
                         MAY 12, 2023
12
                       (REPORTED REMOTELY)
13   *****************************************************

14       ORAL AND VIDEOTAPED DEPOSITION OF JANSSEN THOMPSON,

15   produced as a witness at the instance of the Plaintiff,

16   and duly sworn, was taken in the above-styled and

17   numbered cause on May 12, 2023, from 9:09 a.m. to 12:02

18   p.m., before Donna Wright, CSR in and for the State of

19   Texas, reported by machine shorthand and remotely via

20   Zoom, pursuant to the Federal Rules of Civil Procedure,

21   the 22nd Emergency Order Regarding the COVID-19 State

22   of Disaster, and any stipulations or agreements stated

23   on the record or attached hereto.

24

25
```

Videotaped Deposition of Janssen Thompson

Page 54

1 recommendation after reviewing the transcript whether
2 or not there was any rules violations.
3   Q.  And then once that recommendation is made,
4 then someone in BNSF's Labor Relations department then
5 also looks over the transcript and the exhibits?
6   A.  Typically in dismissal cases, yes, they do
7 review those cases, or during the appeal process Labor
8 Relations will review them.
9   Q.  And critical work practice violations can
10 result in dismissal, can't they?
11   A.  They can -- they can -- they could -- or they
12 can result in dismissal.
13   Q.  And then also would you -- as the general
14 manager in a situation like this, if there is a
15 recommendation of discipline, would you have been
16 provided the transcript and the exhibits to then take a
17 look at and give your opinion about whether or not
18 there -- the charges were proven and whether the
19 discipline is appropriate?
20   A.  Yes, I would be given those documents to
21 review in regard to any testimony, et cetera.
22   Q.  Now, if -- does BNSF have any rule that
23 says -- strike that.
24       Why didn't BNSF preserve a copy of the
25 exhibits and the audio transcript of the formal

Page 55

1 investigation of October 14, 2021?
2   A.  The investigation was canceled prior to its
3 conclusion.
4   Q.  Yes, sir.  Where is BNSF's policy that says
5 when we have an injured employee and we're going to be
6 discussing the circumstances -- we know he's injured,
7 he's reported it to us, we're going to be discussing
8 the circumstances around that injury, and we're going
9 to have an investigation into that; and then when it's
10 all over with, if we cancel the investigation, we're
11 not going to preserve the evidence that was -- that was
12 established and that happened the entire day, where is
13 that policy at?
14   A.  The policy in terms of transcripts?
15   Q.  Yes, sir.  Where is there a policy that says
16 BNSF, you're not to preserve evidence of an audio
17 recording of the plaintiff, Mr. Butler, describing what
18 happened, the exhibits that were attached, where is the
19 policy saying that it is acceptable to not preserve
20 that?
21   A.  So if you look under the collective bargain
22 agreement, and this was an investigation under the --
23 now under the collective bargain agreement.  And if
24 there is -- if there is -- if there is -- if the
25 investigation is canceled, there is no requirement to

Page 56

1 keep a copy of the transcripts under the collective
2 bargain agreement.
3   Q.  Did anyone contact you and say, "We're going
4 to cancel this investigation.  What should we do with
5 the transcript?"
6   A.  No.  I made the decision to cancel the
7 investigation, I made that decision myself.
8   Q.  Okay.  Did you instruct Mr. Christian or
9 anyone else at BNSF to not keep the evidence that was
10 educed and brought forth during the course of this
11 investigation to determine the facts and circumstances
12 surrounding whether this train crew violated those six
13 rules they were charged with?
14   A.  There was -- I told them that there was
15 nothing in the collective bargain agreement that
16 required us to keep a copy of the transcript, and I
17 also verified that with Labor Relations if we needed to
18 keep anything.  And there is nothing in the collective
19 bargain agreement since there was no discipline and the
20 investigation was canceled.
21   Q.  So prior to -- did you instruct Mr. Christian
22 to not preserve the evidence?
23   A.  I don't recall the conversation exactly.  What
24 I did tell them is there is nothing under the
25 collective bargain agreement that says we have to keep

Page 57

1 the transcript of the investigation.  And I don't --
2 and I don't recall, but I don't believe there was any
3 request from any representatives or anyone else.  And I
4 don't know if anyone, in terms of the representative,
5 recorded anything or not because they have a right to
6 do that in the investigation.
7       So I'm not aware of that, but BNSF did
8 not keep a copy of that and was not required to.
9   Q.  Who in Labor Relations with -- strike that.
10       Who did you speak with in Labor Relations
11 that told you it was acceptable not to preserve the
12 recordings and the evidence from October -- the
13 October 14th formal investigation from the evidence
14 that happened that day?  Who told you that --
15       MS. TRAVIS:  Objection, form.
16   Q.  -- in Labor Relations?
17       MS. TRAVIS:  Objection, form.  You can
18 answer.
19   A.  The person that I talked to in Labor Relations
20 was John Murphy.
21   Q.  Who is John Murphy?
22   A.  He's a director in Labor Relations.
23   Q.  Is he an attorney?
24   A.  He may be.  I believe he may be.  But I'm --
25 but he was talking to me in terms of Labor Relations.

Videotaped Deposition of Janssen Thompson

**Page 58**

1  I don't think he practices law that I'm aware of.
2       Q.    All right.  Did knowing -- you told us earlier
3  you knew Mr. Butler was injured in a hard coupling,
4  right?
5       A.    Yes, sir, I do -- I do know that he was
6  injured, yes, sir.
7       Q.    Before you allowed this evidence to be
8  destroyed and not preserved, did you contact anyone
9  with legal and say, "What should we do with this
10 evidence?"
11      A.    So --
12            MS. TRAVIS:  Objection, form.  Hang on.
13 Objection, form.
14            And, Mr. McGuire, I'll let him answer
15 that question, but I'm instructing the witness not to
16 answer about communications with anybody in the law
17 department on this case because that would be protected
18 by the attorney-client privilege.
19            So -- but your question, Mr. McGuire, was
20 did he contact somebody in legal, and I will let him
21 answer that question.  I just wanted to make sure he
22 didn't volunteer.
23            MR. McGUIRE:  Thank you, Susan.  And I
24 realize we're treading on some fine ground here.  But
25 let me say this while we're on the record, that

**Page 59**

1  destroying evidence would be a crime and would be a
2  violation, and so, therefore, it's not protected by the
3  attorney-client privilege.  And so if those discussions
4  were had, then I think we will need to take this up at
5  some point.  So --
6             MS. TRAVIS:  And that -- oh, go ahead.
7             MR. McGUIRE:   I get what you're saying --
8             MS. TRAVIS:  I do want to say something
9  when you're finished.
10            MR. McGUIRE:  Yeah, yeah.  I get what
11 you're saying.  And I'm just stating that spoliation of
12 evidence is not protected by the attorney-client
13 privilege.  That's the -- so I asked the question and I
14 can --
15            MS. TRAVIS:  And I --
16            MR. McGUIRE:  Look, I'm not fussing at
17 all here, Susan.  We're trying to do our jobs.
18            MS. TRAVIS:  Of course.
19            MR. McGUIRE:  And I get this.  I'll ask
20 the question, he can answer that question or not.  But
21 I just wanted to put what our position is going to be
22 on the record.  That's all.
23            MS. TRAVIS:  Sure, sure, sure.  No, I'm
24 not fussing here.  We disagree with your spoliation of
25 evidence theory, and so that may be needed to be

**Page 60**

1  decided by the judge.  I'm not disagreeing that if --
2  you know, that -- if it's a crime, you know, then it
3  would not be protected by the attorney-client
4  privilege.
5             I'm not necessarily -- but I am -- or I
6  do disagree with your characterizing not maintaining a
7  transcript that's not required to be maintained as
8  spoliation or a crime.  So we might need to get over
9  that hurdle first before the -- you know, with the
10 court, and that's completely fine.
11      Q.    So let me -- and before you answer this
12 question, Mr. Thompson, make sure that she doesn't tell
13 you not to answer this question before you blurt out
14 the answer.  Okay?
15            All right.  Did you consult with anyone
16 in the legal department before you permitted the
17 evidence that was discovered and that took place and
18 that was tape-recorded and offered into evidence during
19 the formal investigation discussing this hard coupling,
20 did you -- did you, before you allowed that evidence to
21 not be preserved, discuss that with anyone in BNSF's
22 legal department?
23            MS. TRAVIS:  And, Mr. Thompson, at this
24 point -- it's just a yes or no at this point, if you
25 would, please.

**Page 61**

1       A.    Yes.
2             MR. McGUIRE:  So, Susan, just so that we
3  can preserve, I would start asking questions about who
4  he spoke with and what they told him and what he did
5  with that information.  And so -- and I don't want to
6  waive this and I can go through each one of those, but
7  my impression is you're going to tell him with regard
8  to each one of those questions to not answer it because
9  you believe it's protected by the attorney-client
10 privilege; is that correct?
11            MS. TRAVIS:  That is correct, if you're
12 going to ask who, what was said -- and then what was
13 the third question?
14            MR. McGUIRE:  Well, it's just the details
15 surrounding who the -- who he spoke with in the legal
16 department, what they told him to do with the evidence,
17 and so all of the questions that come with that.
18            And so are you okay with us briefing that
19 issue and saying I'm not waiving those questions
20 regarding the content and substance?  I can go through
21 each one of those questions right now and you can
22 instruct him not to answer each one of them, or we can
23 just take this up at another time.
24            MS. TRAVIS:  I don't mind either way,
25 Clint, Mr. McGuire.

Videotaped Deposition of Janssen Thompson

```
                                                         62
 1        MR. McGUIRE:  Okay.
 2        MS. TRAVIS:  However you feel like you
 3   would like to do.
 4        MR. McGUIRE:  Okay.  Well, then I'll go
 5   through and ask them that way.
 6   Q.   So, Mr. Thompson, who all did you speak with
 7   in BNSF's legal department about preserving the
 8   evidence from the formal investigation transcript?
 9        MS. TRAVIS:  I'm going to instruct you
10   not to answer that question to the extent it -- well,
11   because it invades the attorney-client privilege.
12   Q.   Mr. -- are you going to follow that advice,
13   Mr. Thompson?
14   A.   Yes, I'm following the advice.
15   Q.   What did the persons in BNSF's legal
16   department tell you to do with the evidence that was --
17   that was educed during the formal investigation that
18   BNSF conducted on October 14th concerning this hard
19   coupling?
20        MS. TRAVIS:  I'm going to object to that
21   question and instruct you not to answer, Mr. Thompson,
22   because it invades the attorney-client privilege.
23   Q.   Are you going to follow that advice,
24   Mr. Thompson?
25   A.   Yes, I am going to follow that advice.
```

```
                                                         63
 1   Q.   Did you do what -- did you follow the advice
 2   of whoever you spoke with in BNSF's legal department
 3   about the evidence during the course -- that was
 4   discovered during the course of this hard coupling
 5   investigation?
 6        MS. TRAVIS:  I'm going to object to that
 7   question and instruct you not to answer based on the
 8   attorney-client privilege.
 9   Q.   And are you going to follow that advice?
10   A.   Yes, sir, I am going to follow that advice.
11   Q.   Okay.  Now, Mr. Thompson, you -- how long did
12   this formal investigation involving Mr. Butler and
13   Mr. Pennington on Mr. Cardoza last, do you know?
14   A.   I do not know, sir.
15   Q.   Now, one of the things we would know is we
16   would have an audio recording, if we preserved that,
17   telling us how long it happened, right?
18   A.   If there was -- it would -- it would have the
19   approximate time.  I would assume most all of them do,
20   yes, sir.
21   Q.   And you recognize that this audio recording,
22   the very purpose of this formal investigation was to
23   discuss the facts and circumstances surrounding whether
24   or not Mr. Butler or Mr. Pennington violated any safety
25   and operating rules, those six, which resulted in this
```

```
                                                         64
 1   hard coupling with that Mr. Butler is claiming injured
 2   his back, right?
 3   A.   So can you ask that question again, please?
 4   Q.   Yes.  You knew at the time that the evidence
 5   was not preserved that the formal investigation was
 6   there to discuss the facts and circumstances
 7   surrounding the very hard coupling that injured
 8   Mr. Butler's back?
 9   A.   So still -- I'm still trying -- I'm still
10   trying to understand your question about -- you know,
11   what specifically the question is about the transcript,
12   I guess.  I'm sorry, sir.
13   Q.   No, no.  That's what we're supposed to do
14   here.  So let me break it down a little bit and see if
15   I can do a little better.
16        You knew, as the general manager, that
17   the investigation that BNSF was conducting was
18   discussing the very hard coupling to determine whether
19   or not Mr. Butler and Mr. Pennington and Cardoza
20   violated the six rules you charged them with, and that
21   very same hard coupling is the one that Mr. Butler says
22   injured his back.  You knew, didn't you?
23   A.   We knew the investigation was set to determine
24   any of the rules violations associated with the -- with
25   the hard coupling.  A hard coupling incident is
```

```
                                                         65
 1   something we normally have investigations on, so this
 2   would be like any other investigation for a hard
 3   coupling incident.  We have been doing that protocol
 4   for a number of years, sir.
 5   Q.   My question is a little different.
 6        In investigating this hard coupling --
 7   Mr. Butler had reported that this hard coupling injured
 8   his back.  You knew that, right?
 9   A.   Yes, we knew that there was an injury
10   associated that occurred at some point.  We did know
11   that.
12   Q.   And so during the course of this investigation
13   that was on film, where Mr. Cleveland testified during
14   the course of that, at the very end of that
15   investigation, many times the conducting officer will
16   allow the parties to give a closing argument, right?
17   A.   Under the collective bargain agreement,
18   employees do get a chance to make a statement along
19   with the representative, sir.
20   Q.   And in this instance, do you realize that the
21   entire investigation happened, and then Mr. Butler was
22   giving his closing argument at the -- shortly before
23   you were contacted about whether this investigation
24   needed to proceed?
25   A.   I don't know the exact details of where the
```

Videotaped Deposition of  Janssen Thompson

**Page 66**

1  investigation was at when Mr. Christian called me.  So
2  I do not know -- I do not know the exact timeline in
3  terms of where he was at in the investigation process,
4  sir.
5       Q.   Let me pull up this 10/15/21 Ty Christian
6  document.
7       A.   Yes, sir.
8            (Exhibit 35 marked)
9       Q.   Do you see down at the bottom it's got a
10  BNSF 01099 Bates stamp, do you see that?
11      A.   Yes, sir.
12      Q.   This is a document from BNSF, from Ty
13  Christian to Mathew Prest.  Who is Mathew Prest?
14      A.   He was director of Human Resources.
15      Q.   Okay.  So let's look at the second paragraph
16  of this where Mathew is asking Ty -- or sending an
17  e-mail and asking him to see if the statements made
18  herein are correct.
19           So it says, quote, "We got to the closing
20  statements of the investigation and Mr. Caleb Butler
21  stated he believed BNSF was attempting to fire him
22  because he reported an injury."
23           Do you see that part?
24      A.   Yes, sir, I see that.
25      Q.   It says, "Normally closing statements would be

**Page 67**

1  the end of the investigation."
2           Do you see that part?
3       A.   Yes, sir.
4       Q.   Now, does that refresh your memory -- and if
5  you want me to put that back up, I'm happy to do it.  I
6  wasn't trying to -- hold on.  Let me get it back up.
7            All right.  Feel free to take a look at
8  that.  I've got a different question, but feel free to
9  take a look at that.
10      A.   So just to be clear, sir, I talked to Ty
11  Christian twice during this investigation so I didn't
12  know which time you were referring to, but I did talk
13  to Mr. Christian twice.  He took a recess and called me
14  twice during the investigation process, sir.
15      Q.   Okay.  So during the first conversation, do
16  you recall what time it was that Mr. Pennington [sic]
17  called you?
18      A.   No, I don't remember.  It was -- it was -- it
19  was early on in the investigation when he was
20  questioning one of the witnesses, I believe.  I don't
21  recall specifics, sir.
22      Q.   Okay.  And so let me -- do you want this up to
23  look at or can I --
24      A.   That's fine, you can take it down.  If we need
25  to refer back, we can, sir.  I'm good.

**Page 68**

1       Q.   All right.  If you need it, speak up and we
2  will put it back up there.
3            So my question was actually wrong, so I'm
4  going to re-ask it again.  The question -- I said
5  Mr. Pennington as opposed to Mr. Christian.
6            When -- did you receive two calls from
7  Mr. Christian during the course of the formal
8  investigation?
9       A.   Yes, sir, I did.
10      Q.   What was the -- number one, what was the time
11  of the first call you received?
12      A.   I do not know the time.  It was -- I don't
13  remember -- I didn't -- I don't know the time or date
14  or anything, sir.  Sorry.  I know the date, but I don't
15  know the time and date.
16      Q.   Do you recall the substance of what that first
17  call was about?
18      A.   He had called me to ask me if I had known
19  that -- or what he should do, that -- I think there
20  was -- a question came up about the locomotive defect,
21  and did I know about the locomotive defect, and I --
22  and what he should do, and I advised him to continue on
23  with the investigation and to go ahead and continue
24  asking questions of both the principals and the
25  witnesses in the investigation.

**Page 69**

1       Q.   So when he asked you -- when he called you
2  during the course of this investigation and asked you
3  if you knew about the locomotive defect, what did you
4  tell him?
5       A.   I don't remember, because I don't know if I
6  knew at that time.  I knew it was later on that I found
7  out that there was a report, but that was -- I don't --
8  but told him to go ahead and go through with the
9  investigation, go forward in asking the questions.
10      Q.   All right.  And what defect with the
11  locomotive was he talking about at that point: the
12  chair, the door handle, or the brakes?
13      A.   I do not recall, sir.  I do not recall.
14      Q.   All right.  And then you received a -- have
15  you and I talked about everything that you remember
16  about the first phone call?
17      A.   That's -- that's about the extent of the
18  conversation I remember of the first -- the first call.
19      Q.   And is there anything you can go back and
20  check, any notes, e-mails, text messages, anything like
21  that that would give you any better recollection than
22  what we have already talked about, about what happened
23  during that first phone call?
24      A.   No, I don't recall any other documentation or
25  anything else that I have to check on, sir.

Videotaped Deposition of Janssen Thompson

```
                                                    82
 1  this day.  There was a joint conversation with BNSF's
 2  legal team and Labor Relations.
 3       Q.  Okay.  And -- but that would've been in the
 4  legal department?
 5       A.  Yes, sir.
 6       Q.  Okay.  Now, other than the legal department,
 7  did -- and let me ask this.  Was there -- or I can get
 8  into that some other time.
 9           But have we talked about -- I'm sorry,
10  you looked like you were wanting to interject there.
11       A.  Yes, I need to -- I need to restate my -- you
12  asked me did I talk to anybody besides John Madden and
13  the legal department.
14           Earlier I testified that I did talk to
15  Dentin Chapman as well.  So I did talk to him
16  previously during that day as well, sir.
17       Q.  You know what, I left that out and I just
18  forgot it.  So Dentin Chapman, John Murphy, and Ty
19  Christian?
20       A.  Uh-huh.
21       Q.  All right.  Other than the legal department
22  person, did you speak with anyone else other than
23  Dentin Chapman, John Murphy, or Ty Christian about this
24  investigation or canceling this investigation or what
25  happened in the investigation?
```

```
                                                    83
 1       A.  No, I do not recall talking to anyone else
 2  other than those individuals, sir.
 3       Q.  Have we talked about the substance of all of
 4  the conversations that you had that you can remember
 5  with Mr. Chapman, Mr. Murphy, and Mr. Christian?
 6       A.  At this time, I don't -- I don't know if there
 7  is anything else that I can think of at this time, sir.
 8       Q.  And so let me follow it up with this.
 9           Are there any e-mails, documents, text
10  messages, any type of correspondence of any type, voice
11  recordings, that you would have exchanged with either
12  Mr. Chapman, Mr. Murphy, or Mr. Christian that -- about
13  this investigation or this hard coupling?
14       A.  I don't recall any of those type of
15  documentations or communications, sir.
16       Q.  Now, the reason I'm asking this question,
17  Mr. Thompson, is because I just want to make sure that
18  I get your total recollection of everything that
19  happened.  So I understand what your answer is going to
20  be, I just -- if somebody showed up and they had this
21  great memory afterwards, then I'm asking this question
22  to say, is there anything that you could use to refresh
23  your recollection that would help you tell us more
24  about the conversations you had with Mr. Chapman,
25  Mr. Murphy, and Mr. Christian that you and I haven't
```

```
                                                    84
 1  already talked about today under oath?
 2       A.  No, I cannot think of anything else.
 3       Q.  Thank you.
 4           Was -- was Mr. Madden or Mr. Nesteby
 5  disciplined by BNSF as a result of this?
 6       A.  In terms of discipline, could you -- you know,
 7  what is your definition of discipline, I guess?  I'm
 8  trying to understand your question here.
 9       Q.  Were they reprimanded -- so let's go through
10  that.  When BNSF -- let's talk about scheduled
11  employees.
12           There's different levels of discipline
13  when it comes to them.  For example, they can be fired,
14  they can have a record suspension, they can be given an
15  ops test failure, they can be coached and counseled.
16  Any of those things can be considered discipline.  Is
17  that an accurate statement from my standpoint?
18       A.  So thank you for clarifying that.  Yeah,
19  there's a lot of different -- so I just wanted to
20  understand what -- the context of your question.  So
21  yes, sir.
22       Q.  So my question is, as a result of Jeff
23  Madden's actions and conduct following this hard
24  coupling, did BNSF issue any discipline of any sort or
25  type to them?
```

```
                                                    85
 1       A.  So at the -- here is what I can say about Jeff
 2  Madden.  At his year-end evaluation, he was rated
 3  "needs improvement in leadership."
 4           There were several components to that.
 5  Dentin Chapman, who was his supervisor or his manager,
 6  has all of the details.  I was not a part of the
 7  conversation or a part of that, but we did have some
 8  things we did from a -- from a "needs improvement in
 9  terms of leadership" for his year-end -- for 2021
10  year-end.
11       Q.  Did it affect his bonus in any way?
12       A.  I cannot speak to whether it affected his
13  bonus or not.  I do not -- I do not recall, sir.
14       Q.  Would Mr. Chapman know that?
15       A.  I do -- I do not know if he would or not.  I
16  do not know, sir.
17       Q.  Other than the review where it's -- where he
18  was advised that -- let me ask this.
19           When it says "needs improvement," was
20  that in writing or was that just a verbal statement to
21  Mr. Chapman -- I'm sorry -- Mr. Madden?
22           So let me start that over.
23           Was the "needs improvement" that was done
24  for 2021, was that done verbally or was that put into
25  writing or both?
```

Videotaped Deposition of   Janssen Thompson

**Page 86**

1   A.   Both.
2   Q.   And so was it related to this -- to
3   Mr. Madden's conduct relating to this hard coupling and
4   his actions and conduct surrounding that?
5   A.   It was multiple things, so it was not just one
6   item. So -- and --
7   Q.   Understood. I didn't let you finish and I
8   almost got away the whole deposition without
9   interrupting you and I --
10  A.   That's okay.
11  Q.   So let me let you finish and then I'll come
12  back and --
13  A.   I was -- I'll just restate it.
14         When you look at the leadership, you look
15  at the whole year, and they looked at everything that
16  took place throughout the entire year. And I can't
17  remember all of the components, but there was enough
18  things in there that he was rated "needs improvement"
19  in his leadership for 2021.
20  Q.   Yes, sir. And so let me ask this specific
21  question.
22         Did BNSF determine that as a result of
23  Mr. Madden's conduct and actions surrounding Mr. Butler
24  and this -- and this hard coupling and report of
25  injury, did BNSF determine that his actions or conduct

**Page 87**

1   needed improvement, was that in any way related to --
2   not altogether, but was it related in whole or in part
3   to his conduct surrounding Mr. Butler?
4   A.   There was a component -- from my
5   understanding, a component of it -- of his rating was
6   attributed to what happened, with him having a
7   conversation with the crew prior to the formal
8   investigation.
9   Q.   Okay. And can we agree that if he threatened
10  to fire them for either reporting an injury or
11  reporting a safety condition, that that would be
12  inappropriate on his standpoint?
13  A.   If someone -- if anybody makes a threat
14  against someone, they're going to be held accountable.
15  So BNSF does not tolerate it, whether it's Jeff Madden,
16  it doesn't matter who it is.
17  Q.   And what if -- do you believe that the -- I
18  mean, because one of your jobs as the general manager
19  is to make sure that when this -- when employees
20  violate the rules, that they are held accountable for
21  that. That's part of what you do as a general manager,
22  right?
23  A.   That is a component of my job is to oversee
24  rules compliance.
25  Q.   And part of that is making sure that the

**Page 88**

1   discipline meets the rule violation, right? You want
2   the appropriate discipline for the appropriate conduct,
3   right?
4   A.   I guess in a simple format that could be
5   correct, yes, sir.
6   Q.   So let me ask you this.
7         Do you believe that if a BNSF manager
8   threatens to fire an employee for either reporting an
9   unsafe condition or reporting a personal injury, that a
10  "needs improvement in leadership" is the appropriate
11  remedy for that, the appropriate discipline?
12  A.   I -- it's hard for me to answer your question
13  in the context you stated it in because any time there
14  is an allegation made against any officer, that's why
15  we have HR do a thorough investigation. They
16  investigate and talk to all parties and they will --
17  they will determine whether the -- it was -- it was
18  substantiated or not substantiated in terms of any of
19  the allegations. And then based on that, we will
20  review how that is compared to other cases consistent
21  across BNSF.
22  Q.   And I guess my question is a little bit
23  different. Thank you for your answer.
24         My question is, let's assume that
25  Mr. Pennington and Mr. Butler are telling the truth and

**Page 89**

1   that they were threatened to be fired for reporting an
2   injury and an unsafe condition. Do you believe that
3   the proper discipline in that circumstance is a "needs
4   improvement in leadership" at the end of the year?
5   A.   So if it -- in the context that you said it,
6   if it was a -- a threat made against any employee at
7   BNSF and it was -- it was substantiated through our
8   investigation process, then in terms of the discipline,
9   depending on the circumstances, et cetera, on the
10  surface I would say "needs improvement" probably would
11  not be -- would not be it, if -- just based on the way
12  you described it.
13  Q.   Mr. Thompson, have I been polite and courteous
14  to you?
15  A.   Yes, sir.
16  Q.   All right. Thank you for your time today.
17  I'll pass the witness. And I wish you the best of luck
18  in retirement and I hope this is the last time we see
19  each other under these circumstances.
20  A.   Thank you, sir. Appreciate it.
21              EXAMINATION
22  BY MS. TRAVIS:
23  Q.   Mr. Thompson, when did you become employed by
24  BNSF Railway?
25  A.   1988.