```
                                                         Page 1

 1             IN THE UNITED STATES DISTRICT COURT
 2              FOR THE EASTERN DISTRICT OF TEXAS
 3                       BEAUMONT DIVISION
 4     _____
 5     CALEB BUTLER and JEREMY
 6     PENNINGTON,
 7            Plaintiffs,
 8         v.                              Case No.
 9     BNSF RAILWAY COMPANY,               1:22-cv-00367
10            Defendant.                   -MJT
11     _____
12                  VIDEOTAPED DEPOSITION OF
13                       CALEB BUTLER
14     DATE:       Tuesday, December 6, 2022
15     TIME:       9:38 a.m.
16     LOCATION:   Martinez & McGuire, PLLC
17                 17227 Mercury Drive, Suite B
18                 Houston, TX 77058
19     REPORTED BY:  Kelly Caldwell, Notary Public
       Job No. CS5591167
20
21
22
23
24
25
```

Page 30

1  up to was on air, so it didn't move.
2    A   That's what it felt like to me.
3    Q   That's what it felt like.  Is that common
4  that one cut of cars is under pressure and won't move,
5  and another cut of cars is floating free out there,
6  for lack of a better term?  Is that uncommon?
7    A   No.
8    Q   And was there anything uncommon about this
9  particular one when you had the issue with the seat?
10   A   Well, what was uncommon about it was my seat
11 gave way.
12   Q   And I understand that, and again, I'm
13 sensitive to that's not what this case is about.
14   A   No.  Yeah.
15   Q   So I'm going to try to keep those as
16 separate as I can.  I guess, I'm trying to figure out
17 if there was something abnormal about the fact that
18 that cut of cars didn't move.
19       Were you expecting that cut of cars to not
20 be under the pressure?  I mean, was there anything
21 just abnormal about that other than the fact that it
22 just --
23   A   No.  It would've been a normal day had my
24 seat not, you know, gave way.  That's the only thing
25 that made it abnormal, you know, 'cause I've coupled

Page 31

1  up to cars that's on air at 4 miles an hour daily, you
2  know.  Wasn't a --
3    Q   And you mentioned 4 miles an hour.  Is that
4  BNSF rule about coupling speeds or anything?
5    A   Yes.  I mean, you're supposed to be 4 miles
6  an hour or less on coupling up.
7    Q   All right.  And I would like to go ahead and
8  show you what we'll introduce as Exhibit Number 1
9  here.  Do you recognize this?
10       (Exhibit 1 was marked for
11        identification.)
12   A   Yes.
13   Q   All right.  And is this the statement that
14 you gave about the incident we've been talking about?
15   A   Yes.  It looks familiar.
16   Q   And the reason I want to show you this is I
17 think you used the term here -- yeah -- "sometime
18 before lunch, we made a joint that was harder than
19 normal."
20   A   Yeah.
21   Q   Do you see that?  And so, I'm trying to be
22 careful in the words that I use, and I just want you
23 to understand that I'm not trying to put words in your
24 mouth, that I'm trying to follow the words of your
25 report here.

Page 32

1    A   Yeah.
2    Q   Okay.  All right.  And then, do you remember
3  turning in this report --
4    A   Yes.
5    Q   -- or this statement?  Who did you turn that
6  into?
7    A   Chad Nesteby.
8    Q   And when did you do that?
9    A   I think this was a Sunday following the
10 incident that happened on Thursday.
11   Q   Okay.  And the 19th was a Thursday; right?
12   A   Mm-hmm.
13   Q   Okay.  So then, this would've been the
14 following Sunday.  Now, on the 19th, did you verbally
15 report anything to Chad?
16   A   Yes.  I thought -- I thought there was
17 another form that I turned in to him Thursday about --
18 I'm not 100 percent sure, but yeah, I did say
19 something to him about it.
20   Q   Well, here, we'll introduce what we'll mark
21 as Exhibit Number 2 here.  Do you recognize this
22 document?
23       (Exhibit 2 was marked for
24        identification.)
25   A   Yeah.

Page 33

1    Q   Is this the personal injury report that you
2  filled out?
3    A   Let me look at it and see.
4        Yes, it is.
5    Q   All right.  Now, is the document that you
6  filled out on that Thursday or do you think that you
7  did this on that Sunday as well?
8    A   It seems -- I can't recall, but it seems
9  like I turned one in on Thursday and one in on a
10 Sunday, but let me look and see if I dated it.
11       Well, this one says the 19th, and this one
12 says the 19th, so.
13   Q   I think that --
14   A   I think the personal injury, I probably
15 turned in on that Sunday, and it just back dated it
16 for the 19th for the --
17   Q   Okay.  But on the 19th, you think that you
18 -- was it probably, like, at least a verbal report to
19 Chad?
20   A   Yes.
21   Q   All right.  Was there anybody else that you
22 talked to?
23   A   Just my crew, you know.
24   Q   Okay.  And do you remember -- I know it's
25 been some time.  But can you remember specifically

9 (Pages 30 - 33)

Page 86

1  Q  All right. I want to talk about the
2  evidence you mentioned; right? You said that
3  Mr. Cleveland had some documentation, evidence that
4  showed that you think was ultimately shown to be
5  inaccurate; that it couldn't have worked this way,
6  that one locomotive was moving 5 miles an hour and the
7  other one 3. And that may not be the specific, but
8  that was an example; right?
9  A  Yes.
10 Q  In a hypothetical world where that's --
11 let's assume all that is true; right? Wouldn't it be
12 reasonable of a railroad to think -- wouldn't it be
13 reasonable that whoever was looking at that from the
14 railroad made a mistake, and that once that mistake
15 was shown to them, they said "Oh. Wait. This wasn't
16 a violation," and that that's kind of the purpose of a
17 fact investigation hearing, to give you the
18 opportunity to push back on some of that kind of
19 stuff?
20 A  Yeah. You would think so, but he seen it
21 that day, and it didn't -- it didn't change his mind.
22 He still accused me of all these violations and -- and
23 charged me with them, you know, until -- until that
24 phone call was made.
25 Q  Was Scott Cleveland there when you talked to

Page 87

1  Ty Christian about the Madden stuff?
2  A  I -- I don't remember if he was in the room
3  or not. He was kind of in and out all day, you know,
4  so.
5  Q  Is that kind of how it works? You know, a
6  witness will come in and testify and then, they're not
7  necessarily going to hang out for the whole day.
8  A  Yes.
9  Q  Okay. So you don't know if Mr. Cleveland
10 was there for any of the Madden stuff at all?
11 A  I don't -- I don't recall.
12 Q  All right.
13 A  But, I mean, I felt like there was a room
14 full of people, you know. I mean, like, I don't know
15 if every single person in the investigation was in
16 there or if somebody left out. But I don't remember.
17 It was, like I said, over a year ago, so.
18 Q  Do you know Scott Cleveland?
19 A  I've been around him 'cause at all the
20 quarterly safety meetings and stuff.
21 Q  Any interactions or anything with him?
22 A  Other than, you know, just in passing, like
23 the safety meetings, you know.
24 Q  Before your investigation, what were your
25 thoughts about Mr. Cleveland?

Page 88

1  A  I personally don't -- didn't like him, you
2  know.
3  Q  Any reason for that or?
4  A  Yeah. 'Cause they -- I mean, the -- well,
5  they call him the executioner, you know. He comes in
6  to fire people. That's about the only time you see
7  him, you know.
8  Q  Who calls him the executioner?
9  A  Everybody at the railroad. I mean, that's
10 who they call in to -- when they get ready to fire
11 people, you know. You don't ever really see him show
12 up until somebody's about to get terminated.
13 Q  Is that anecdotal or is that because every
14 time you've seen Scott Cleveland testify at a hearing,
15 that person gets fired?
16 A  I'm not the one that give him the name. I'm
17 just, you know --
18 Q  Fair enough. Fair enough.
19    All right. Do you know Janssen Thompson?
20 A  I've met him.
21 Q  What do you think about Janssen?
22 A  He seemed -- he seemed to be a nice guy as
23 far as I can tell, you know, in the few times I've
24 talked to him.
25 Q  What about Dentin Chapman?

Page 89

1  A  He seems to be a decent guy, you know.
2  Q  Do you believe that either of these guys,
3  Janssen or Dentin, retaliated against you?
4  A  I think it was a group effort, you know, of
5  the whole BNSF, you know. Everybody out there is
6  scared for their job, you know. Every single person,
7  no matter what their title, they're all scared they're
8  going to get fired if they don't do what this guy says
9  above them, you know. I mean, it's a --
10 Q  Like you said, "everybody out there," is
11 that just kind of a general fear of the railroad or?
12 A  That's just how the railroad operates. The
13 fear -- I mean, they try to put fear in people. You
14 know, they -- threats and stuff like that, that's just
15 how they operate. I mean, I can't explain it no other
16 way except for --
17 Q  Give me an example of threats; right?
18 A  Yeah. Yeah.
19 Q  I mean, because we're talking in these broad
20 general terms. If we can get a specific. I mean, can
21 you think of, "at a safety briefing, I heard somebody
22 say this," that you thought was threatening that's an
23 example of what you're talking about? Can you give me
24 any?
25 A  Well, I just know people out there that

23 (Pages 86 - 89)

Page 146

1    THE REPORTER: And would you like to
2  order a copy of the transcript?
3    MR. MCGUIRE: No, thank you.
4    THE VIDEOGRAPHER: We are off the
5  record at 12:43.
6    (Signature reserved.)
7    (Whereupon, at 12:43 p.m., the
8    proceeding was concluded.)

Page 148

1    CERTIFICATE OF TRANSCRIBER
2    I, LAUREN STAHL, do hereby certify that this
3  transcript was prepared from the digital audio
4  recording of the foregoing proceeding, that said
5  transcript is a true and accurate record of the
6  proceedings to the best of my knowledge, skills, and
7  ability; that I am neither counsel for, related to,
8  nor employed by any of the parties to the action in
9  which this was taken; and, further, that I am not a
10 relative or employee of any counsel or attorney
11 employed by the parties hereto, nor financially or
12 otherwise interested in the outcome of this action.

15   LAUREN STAHL

Page 147

1    CERTIFICATE OF DEPOSITION OFFICER
2    I, KELLY CALDWELL, the officer before whom
3  the foregoing proceedings were taken, do hereby
4  certify that any witness(es) in the foregoing
5  proceedings, prior to testifying, were duly sworn;
6  that the proceedings were recorded by me and
7  thereafter reduced to typewriting by a qualified
8  transcriptionist; that said digital audio recording of
9  said proceedings are a true and accurate record to the
10 best of my knowledge, skills, and ability; that I am
11 neither counsel for, related to, nor employed by any
12 of the parties to the action in which this was taken;
13 and, further, that I am not a relative or employee of
14 any counsel or attorney employed by the parties
15 hereto, nor financially or otherwise interested in the
16 outcome of this action.

     KELLY CALDWELL
20 Notary Public in and for the
   State of Texas
21 [X] Review of the transcript was requested.

Page 149

1  Clint E. Mcguire, Esquire
2  clint@mmtriallawyers.com
3          December 20th, 2022
4  RE: Butler, Caleb, Et Al. v. BNSF Railway Company
5  12/6/2022, Caleb Butler (#5591167)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 (erratas-cs@veritext.com).
17   Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
22      Yours,
23      Veritext Legal Solutions

38 (Pages 146 - 149)

Veritext Legal Solutions
800-567-8658                                     973-410-4098

**EXHIBIT C**