```
                                                        Page 1
 1              IN THE UNITED STATES DISTRICT COURT
 2                FOR THE EASTERN DISTRICT OF TEXAS
 3                        BEAUMONT DIVISION
 4         _____
 5     CALEB BUTLER and JEREMY
 6     PENNINGTON,
 7              Plaintiffs,
 8          v.                               Case No.
 9     BNSF RAILWAY COMPANY,                 1:22-cv-00367-MJT
10              Defendant.
11         _____
12            VIDEOTAPED DEPOSITION OF JEREMY PENNINGTON
13     DATE:          Tuesday, December 13, 2022
14     TIME:          9:08 a.m.
15     LOCATION:      Martinez & McGuire, PLLC
16                    17227 Mercury Drive, Suite B
17                    Houston, TX 77058
18     REPORTED BY:   John Shavers, Notary Public
       Job No. CS5591181
```

Page 158

1   Q   How well do you know Dentin?
2   A   I've talked to him on the phone. He said if
3   I ever — because of the situation that I was in, in
4   Beaumont, to call him, but I only talked to him one
5   other time.
6   Q   Do you feel like Mr. Chapman retaliated
7   against you?
8   A   No.
9   Q   Do you feel like Mr. Thompson retaliated
10  against you?
11  A   No.
12      MR. FLOYD: All right. I think this
13  pulled up now. I want to show you — oh, gosh. Of
14  course, this is going slow. Do you want to take a
15  look at this before I — it's just his investigation
16  letter from November 21.
17      MR. MCGUIRE: That's all right.
18      MR. FLOYD: All right.
19  BY MR. FLOYD:
20  Q   I'm going to show you what is — it's an
21  investigation letter from November 30, 2021, addressed
22  to you, that says, "An investigation has been
23  scheduled at 1100 hours" —
24  A   Oh, yes, I do recall that.
25  Q   — "for December 15th."

Page 159

1   A   You're right. I did get an investigation
2   letter, and then when I took responsibility for it,
3   and they gave me --
4   Q   Okay. I just wanted to clear that up. I
5   just wanted to clear — all right. So, after this
6   incident, you did get another investigation letter and
7   another investigation hearing was scheduled with BNSF,
8   right?
9   A   Yeah.
10  Q   Did you have —
11  A   My union reps told me, "Don't worry about
12  it." They're going to — why don't you take the admit
13  you were at fault, and it'll go away.
14  Q   So, you didn't have similar concerns about
15  the second investigation that you did the first one
16  because your union?
17  A   I just — I already knew what I was going
18  into at that point. I was already out the door, to be
19  honest with you, man.
20  Q   Okay.
21  A   I was just trying to get to the first of the
22  year.
23  Q   Why is that?
24  A   I didn't — huh? Why?
25  Q   Yeah.

Page 160

1   A   Because I was already going to quit.
2   Q   When did you decide that you were going to
3   quit?
4   A   The moment that Jeff gave me the cold
5   shoulder at the crew office because I wanted to go
6   back to working. I felt like I did nothing wrong at
7   the time, all the way up, and I felt like I was still
8   going to be retaliated against, against him, because
9   he had made a statement that I'm never talking to that
10  guy again. And Dentin told him, "Yes, you are because
11  that's your job." And then when I was cold-shouldered
12  at the crew office, I felt like I couldn't go back to
13  work, in a normal situation, a normal setting, because
14  I had been harassed by this guy.
15      I had been threatened by this guy, and I had
16  been lied to. And now, he's doing exactly what he
17  said he was going to do to this other guy, to me. I
18  was already getting — working on getting my teaching
19  certification. I had already gotten hired at Beaumont
20  United. I didn't want to go work there. So, I waited
21  until the end of the year, when I found a job that I
22  could at least feel more comfortable with.
23  Q   All right. So, I think the timeline on this
24  is important. So, the cold shoulder situation that
25  you just described happened, you said, about a month

Page 161

1   after the investigation. So, that would've been
2   sometime in mid-November, roughly?
3   A   Probably.
4   Q   And that was —
5   A   I said about a month.
6   Q   Sure, sure. And I get it. It doesn't —
7   A   It was prior to me putting the car in the
8   ground.
9   Q   But it was somewhere in there, in November,
10  that that was when you said, "All right. I'm leaving.
11  I'm done." All right.
12  A   I was already pretty much at that
13  conclusion, prior to that, because of the stress. But
14  when that happened, it was like that was the final
15  straw.
16  Q   All right.
17  A   Because I feel like I couldn't go back to
18  work without — what's going to happen next time I get
19  in trouble. They tried to — they told me they were
20  going to fire me over something I didn't do. I was
21  doing my job. And so, what happens when I really —
22  something does happen?
23  Q   All right.
24  A   Then it did happen.
25  Q   Let's — I'll give everybody a copy. This

41 (Pages 158 - 161)

## Page 186

1  tie brakes.
2    Q   Okay.  Do you happen to have a copy of any
3  of the exhibits or anything like that, that was
4  presented at the investigation hearing?
5    A   No, I forwarded everything I have to my
6  lawyers.
7    Q   Okay.  Do you know if by chance maybe your
8  union rep or one of the other guys' union reps was
9  recording the investigation?
10   A   No.
11   Q   No?  All right.  I think that's all the
12 questions I've got for you, Mr. Pennington.  So, it's
13 been a long day, but I think I'm done.  I'll pass the
14 witness.
15         MR. MCGUIRE:  We'll reserve ours for
16 the time of trial.  He will read and sign.  And I'll
17 order a copy of the transcript.  Steve doesn't need
18 one.
19         MR. FLOYD:  I'll take a copy of the
20 transcript and a copy of the video.
21         VIDEOGRAPHER:  Okay.  That's it.  Okay.
22 Can I go – this will conclude the deposition for Mr.
23 Pennington.  We are off the video record at 12:44 p.m.
24         (Whereupon, at 12:44 p.m., the
25         proceeding was concluded.)

## Page 187

1         CERTIFICATE OF NOTARY PUBLIC
2    I, JOHN SHAVERS, the officer before whom the
3  foregoing proceedings were taken, do hereby certify
4  that any witness(es) in the foregoing proceedings,
5  prior to testifying, were duly sworn; that the
6  proceedings were recorded by me and thereafter reduced
7  to typewriting by a qualified transcriptionist; that
8  said digital audio recording of said proceedings are a
9  true and accurate record to the best of my knowledge,
10 skills, and ability; that I am neither counsel for,
11 related to, nor employed by any of the parties to the
12 action in which this was taken; and, further, that I
13 am not a relative or employee of any counsel or
14 attorney employed by the parties hereto, nor
15 financially or otherwise interested in the outcome of
16 this action.

20   *[signature]*
     JOHN SHAVERS
21   Notary Public in and for the
     STATE OF TEXAS
22   [X] Review of the transcript was requested.

## Page 188

1         CERTIFICATE OF TRANSCRIBER
2    I, SONYA LEDANSKI HYDE, do hereby certify
3  that this transcript was prepared from the digital
4  audio recording of the foregoing proceeding, that said
5  transcript is a true and accurate record of the
6  proceedings to the best of my knowledge, skills, and
7  ability; that I am neither counsel for, related to,
8  nor employed by any of the parties to the action in
9  which this was taken; and, further, that I am not a
10 relative or employee of any counsel or attorney
11 employed by the parties hereto, nor financially or
12 otherwise interested in the outcome of this action.

15   *[signature]*
     SONYA LEDANSKI HYDE

## Page 189

1  Clint E. Mcguire, Esquire
2  clint@mmtriallawyers.com
3         December 29th, 2022
4  RE:   Butler, Caleb, Et Al. v. BNSF Railway Company
5        12/14/2022, Jeremy Pennington (#5591181)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 (erratas-cs@veritext.com).

17   Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.

22         Yours,
23         Veritext Legal Solutions